UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re

CANDI CONTROLS, INC.,[1]

Debtor.

Chapter 11

Case No. 18-10679 (CSS)

## DEBTOR'S MOTION FOR ORDERS APPROVING: (A) NOTICE AND BIDDING PROCEDURES FOR SALE OF SUBSTANTIALLY ALL ESTATE ASSETS; AND (B) SALE OF SUBSTANTIALLY ALL ESTATE ASSETS

Candi Controls, Inc., debtor-in-possession in this Chapter 11 case (the "**Debtor**"), respectfully moves the Court for: (A) an order under Bankruptcy Code §§ 363(b), (f), and (m) and 365(a), (c)(1), and (f)(2) and Bankruptcy Rules 6004 and 6006[2] authorizing the Debtor to sell substantially all assets of the estate free and clear of all liens, claims, encumbrances, and interests, and to assume and assign certain executory contracts and unexpired leases, to Altair Engineering, Inc. ("**Altair**"), under the *Asset Purchase Agreement* between the Debtor and Altair substantially in the form attached to this Motion as Exhibit A (the "**APA**"); and (B) an order, on shortened notice, approving bidding procedures pertaining to the sale and the solicitation of higher and better offers, the method and timing of notices pertaining to the sale, approving of the Breakup Fee and Expense Reimbursement (defined below), and setting a hearing to approve the sale. This Motion is supported by the entire record before the Court, the *Declaration of Douglas Klein in Support of First Day Motions* (the "**First-Day Declaration**") filed

---

[1]  The last four digits of the Debtor's federal tax identification number are 4409.  The Debtor's principal place of business is 428 13th Street, Third Floor, Oakland, CA 94612.

[2]  Unless otherwise noted, all section (§) references are to the U.S. Bankruptcy Code, 11 USC §§ 101 *et seq.* All Rule references are to the Federal Rules of Bankruptcy Procedure.

on March 28, 2018, and the *Declaration of Douglas Klein in Support of Sale Motion* filed contemporaneously with this Motion, and by the following:

## BACKGROUND

**Jurisdiction and Venue**

1.  On March 23, 2018 (the "**Petition Date**"), CGM Partners, LLC, Howard Elias, and Kelly Yang Living Trust filed an involuntary petition in this Court under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**") against the Debtor. The Debtor filed its *Certificate of Counsel Regarding Proposed Order for Relief in Involuntary Case* on March 23, 2018. The Court entered the Chapter 11 order for relief on March 27, 2018 (the "**Relief Date**"). The Debtor now operates its business and manages its assets as a debtor-in-possession under Bankruptcy Code §§ 1107 and 1108.

2.  This Court has jurisdiction over this Chapter 11 case under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b)(2). Under Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtor consents to the Court's entry of a final order on this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection with this Motion consistent with Article III of the United States constitution. Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3.  The statutory bases for the relief this Motion seeks are Bankruptcy Code §§ 105, 363(b) and (f) and 365(a), (c)(1), and (f)(2), and Bankruptcy Rules 6004 and 6006.

4.   No official committees have been appointed in this case. No party has requested the appointment of a trustee or an examiner.

**Background Facts Concerning the Debtor**

5.   In support of this Motion, the Debtor offers the factual statements contained in the First-Day Declaration.

**Necessity of Sale of Assets**

6.   The Debtor believes that the petitioning creditors, representing the Debtor's unsecured creditors, initially commenced this case with the principal goal of having the Debtor implement a § 363 sale of substantially all the Debtor's assets to Altair under the APA. All parties are aware that Altair is unwilling to consummate any purchase of the Debtor's assets, the sole foreseeable source of any recovery for the Debtor's creditors, unless the sale is approved by this Court free and clear of interests under § 363(f). Altair currently represents the only party expressing a willingness to complete a transaction that will realize the value of the Debtor's assets under the present circumstances.

7.   As more fully described in the Klein Declaration, for several months prepetition, the Debtor has had no appreciable productive operations and no material revenue. Having undertaken extensive searches for additional financing through the services of investment banking firms and having exhausted all previous sources of financing, the Debtor's available operating cash was being steadily depleted, requiring the Debtor to aggressively seek a buyer of its assets as a means of preserving those assets' value and providing a recovery to the Debtor's creditors. That process produced but one viable buyer—Altair—who indicated a willingness to complete a transaction that will provide a recovery to the Debtor's creditors and preserve the jobs of several of the Debtor's engineering employees. Because the Debtor's operating cash was all but depleted by the Petition Date, the Debtor requested that Altair provide debtor-in-possession financing to fund operations for a short period during which a § 363 sale process could be commenced, Altair's offer will be tested against the market for

higher and better offers, and the interests of the Debtor's creditors will be protected. Altair was willing to provide financing and to expose its purchase offer to possible competing offers (with customary stalking-horse protections) but would only do so within the confines of a Chapter 11 proceeding.

8.    Without a going-concern sale of the Debtor's assets, the Debtor does not believe there exists a viable means to salvage sufficient value in the Debtor's intellectual property assets to provide even a modest recovery to creditors. And because Altair was willing to provide only so much financing to sustain operations for a few weeks, the Debtor must respectfully urge the Court to approve a sale process that contemplates a closing of the sale within approximately 30 days. If financing runs out before a sale is completed, the Debtor's engineering employees—whose commitment and ongoing services are critical to the functionality of the Debtor's software applications and, ultimately, to the value of the Debtor's assets—will leave the Debtor's employ for other work, severely undermining the value of the Debtor's assets and jeopardizing or even destroying any possibility that the Debtor will be able to complete with Altair or with anyone else a sale of those assets for the benefit of creditors.

9.    Accordingly, the Debtor and Altair propose to complete an integrated transaction that would accomplish two basic things: (a) Altair's purchase of substantially all the Debtor's assets under the APA; and (b) the Debtor's assumption and assignment to Altair of certain executory contracts and the unexpired lease for the Debtor's principal business location in Oakland, California.

**Assets, Contracts, and Leases**

10. The assets the Debtor proposes to sell to Altair are defined as the "Purchased Assets" in the APA and comprise, among other assets identified in the APA: (a) all the Debtor's worldwide intellectual property rights, including all the Debtor's software applications, source code, firmware, data, etc., all copyrights, trademarks, and patent and patent applications,

together with all associated expressions and license rights, all as more fully defined in the APA as the "Intellectual Property Rights"; (b) all personal property equipment primarily related to the Debtor's business; (c) all inventory; (d) the Debtor's name and other brand names and trademarks; (e) all the Debtor's books and records used in connection with the Purchased Assets of the Debtor's business, including all "Patent and IP Related Documentation" (as defined in the APA); and (f) all claims and causes of action, including avoidance actions arising under the Bankruptcy Code against the Debtor's customers, employees, or counterparties to any executory contracts or leases to be assumed and assigned to Altair (collectively, and as further identified and described in the APA, the "**Assets**"). The proposed sale would not transfer certain assets explicitly excluded from "Purchased Assets" and defined as the "Excluded Assets" in the APA, including the Debtor's cash, any avoidance actions not against customers, employees, or contract counterparties, and the Debtor's books and records it must retain by applicable law (described and defined in the APA as "Retained Books and Records").

11. The Debtor also proposes to assume and assign to Altair those executory contracts identified in the APA as "Assumed Contracts" and "Assumed Leases," which include, notably, the Debtor's leasehold interest in its principal premises located at 428 13th Street, 3rd Floor, Oakland, California 94612 (the "**Oakland Lease**").

12. The Debtor's ability to sustain operations even through the Petition Date was enabled by secured emergency bridge financing obtained as soon as the Altair transaction became a possibility. In connection with providing the Debtor with mission-critical operational funding for March 2018 in anticipation of the Altair sale, two existing unsecured creditors (i.e., holders of convertible notes), Nicholas Brown and Konstantinos Exarchos, loaned $200,000 to the Debtor on or about March 1, 2018, and obtained a security interest in all the Debtor's assets, perfected by a UCC-1 financing statement filed with the Delaware Department of State on March 1, 2018. This prepetition secured loan is identified in the APA as the "Bridge Period Funding" and Messrs. Brown and Exarchos as the "Bridge Loan Lenders," along with Asher

Waldfogel, Doug Harp, and Steve Raschke, all three of whom are insiders of the Debtor who, together with Mr. Brown, extended an additional $23,000 in loans to the Debtor shortly before the Petition Date, secured by a UCC-1 financing statement filed with the Delaware Department of State. To the Debtor's knowledge, no other party other than the Bridge Loan Lenders claims a prepetition security interest in any of the Debtor's assets.

**Material Terms of APA[3]**

13. The Debtor proposes to sell substantially all its assets to Altair free and clear of all interests under § 363(b) and (f) under the APA, the material terms of which are:

a. *Purchase Price.* Section 2.4 of the APA provides that Altair will pay gross cash consideration of: (i) $2,000,000; *plus* (ii) an amount equal to the lesser of (A) $220,000 or (B) the amount then due to satisfy the principal and interest due to the Bridge Loan Lenders; *plus* (iii) forgiveness of the amount loaned under the debtor-in-possession financing sought to be approved in this case (defined as the "DIP Amount" in the APA, which cannot exceed $375,000); *minus* (iv) the "Purchase Price Credits," comprising (1) any portion of the DIP Facility advanced but not spent by the Debtor by the Closing, (2) any amount advanced under the DIP Facility over $200,000, and (3) any amount the Debtor pays for professional fees and costs (all without duplicating dollars among these three credits), for a total cash purchase price of approximately $2,600,000. Under Section 7.3 of the APA, an Indemnification Escrow Amount of $1,000,000 is to be held back from the gross purchase price at closing for one year (*see* Section 9.6 of the APA) to provide Altair with a remedy for any claims by Altair against the Debtor arising from the Debtor's obligation to indemnify Altair under Section 9.2 of the APA for, among other things, a breach of the Debtor's representations and warranties under the APA.

---

[3] What follows is a summary of the APA, provided to comply with Local Rule 6004-1(b). The Court and all parties in interest should read the APA, attached to this Motion as Exhibit A, in its entirety. The APA's specific provisions control in all respects. Undefined capitalized terms used in this summary carry the meanings given to them in the APA.

b.  *Purchased Assets.* Section 2.1 of the APA identifies and describes the assets proposed to be sold, which constitute substantially all the Debtor's assets. Section 2.2 of the APA identifies and describes the few assets not proposed to be sold, which includes the Debtor's cash, certain avoidance actions, and the Debtor's Retained Books and Records.

c.  *Assumed Contracts and Assumed Leases.* Section 2.1(b) and (c) (and the corresponding schedules to the APA) identify and describe the contracts and leases to be assumed and assigned to Altair, which include, most notably, the Oakland Lease.

d.  *Assumed Liabilities.* Altair has agreed to assume the liabilities identified and described in Section 2.5 of the APA, including all liabilities associated with Altair's operation of the Purchase Assets arising after the Closing, all post-Closing liabilities arising under the Assumed Leases and Assumed Contracts, and all post-Closing-allocated Property Taxes.

e.  *Excluded Liabilities.* Altair does not assume the liabilities identified and described in Section 2.6 of the APA, including any pre-Closing claims against the Debtor arising under contract, tort, warranty, product liability, environmental, tax, or other bases, the Debtor's pre-Closing Indebtedness, any liabilities associated with the Debtor's employees including pre-Closing liabilities associated with those employees (defined in the APA as the "Transferred Employees") Altair would employ post-Closing, or any Cure Costs associated with the Assumed Contracts and Assumed Leases. (As described below, the Debtor does not believe any counterparty to an executory contract or unexpired lease is owed a cure amount under § 365(b).)

f.  *Deposit.* In addition to providing up to $375,000 in debtor-in-possession financing, Altair has funded into escrow a deposit toward the Purchase Price of $200,000, which is being held by Altair's counsel. *See* APA § 2.9(a). The deposit is released to the Debtor's estate if the Debtor terminates the APA for, among other things, Altair's breach. *See* APA § 2.9(b).

g.  *Timing.* In consideration of the extensive prepetition marketing of the Debtor's assets for sale, the APA requires that the Bid Procedures described below be approved as soon as possible so that the period of soliciting potentially higher and better offers can commence

immediately and the Sale Hearing (defined below) and Closing can occur as quickly as possible. The Debtor anticipates having available funding under the debtor-in-possession financing for approximately 30 days from the Petition Date. To aid in a prompt Closing, the APA requires as a provision of the Sale Order a waiver of the stays provided for under Bankruptcy rules 6004(h) and 6006(d). *See* APA § 3.3(s).

h.  *Other Provisions.* As required in Local Rule 6004-1(b)(iv), the Debtor highlights these additional provisions in the APA:

> i.  *Agreements with Employees.* Altair has spoken with the majority of the Debtor's employees about future employment with Altair following the Closing. Altair intends to make employment offers to most, if not all, the Debtor's employees in connection with the proposed sale. In addition, Altair has proposed entering into a short-term (approximately three months) consulting agreement with Steve Raschke, the Debtor's chief executive officer (and Bridge Loan Lender and holder of notes by and equity interests in the Debtor). Entry into employment arrangements with Altair's designated key employees is a condition to the Closing. *See* APA § 6.1(h).
>
> ii.  *Auction Contemplated.* As described extensively elsewhere in this Motion, the Debtor's proposed sale of substantially all its assets to Altair is subject to higher and better bids to be solicited by employing the proposed Bid Procedures described below and considered at an Auction described below. *See* APA § 3.1.
>
> iii.  *Deadline for Closing.* Either the Debtor or Altair may terminate the APA if the Closing has not occurred by the "Outside Date," which is 60 days following the Petition Date. *See* APA § 8.1(b).
>
> iv.  *Retention of Records.* The APA excludes from the assets to be sold Retained Books and Records and contemplates the Debtor retaining all books and records necessary to enable the Debtor to administer this case. The APA also requires Altair to provide the Debtor with access to all the Debtor's books and records from and after the Closing. *See* APA § 2.2(a), 5.4.
>
> v.  *Sale of Avoidance Actions.* The APA provides for the sale of Chapter 5 avoidance actions against the Debtor's customers, any Key Person (*i.e.,* an employee to be hired by Altair), or any counterparties to Assumed Contracts or Assumed Leases. *See* APA § 2.1(n).
>
> vi.  *Successor Liability.* The APA requires that the Court's order authorizing the sale find, among other things, that Altair is not a successor to or alter ego of the Debtor or its estate. *See* APA § 3.3(n).

vii. *No Other Provisions.* The APA does not provide for or contemplate any of the provisions listed in Local Rule 6004-1(b)(iv) not noted above. The proposed sale is not to an insider—Altair is unaffiliated in all ways with the Debtor. The Debtor does not propose to release sale proceeds on or after the Closing without further Court order. There are no interim management or similar arrangements with Altair regarding the Debtor's operations before the Closing. There is no provision in the APA that requires the sale to be declared exempt from taxes under Bankruptcy Code § 1146(a). The sale would not be free and clear of any unexpired leases. The APA does not implicate or affect the credit bid rights of any party under Bankruptcy Code § 363(k).

## RELIEF REQUESTED

14. The Debtor requests two orders:

a. An order, which the Debtor requests be considered on shortened notice, substantially in the form attached as Exhibit B approving the Bid Procedures, the Breakup Fee, and the Expense Reimbursement (all as defined below), establishing notice provisions of the Bid Procedures and the Sale Hearing, and setting the date and time for the Sale Hearing (the "**Bid Procedures Order**");

b. An order under § 363(b) and (f) authorizing the Debtor to sell all the Assets to Altair free and clear of all liens, claims, encumbrances, and interests in those Assets and under § 365(a), (c), and (f) authorizing the Debtor to assume and assign to Altair the executory contracts identified in the APA as "Assumed Contracts") and the Oakland Lease subject to the payment of any determined cure amount (the "**Sale Order**").

**Bid Procedures**

15. The Debtor proposes that the following procedures (the "**Bid Procedures**") be approved and employed to solicit and consider any competing higher and better bids for purchase of the Assets:[4]

---

[4] The full recitation of the Bid Procedures below includes all provisions required to be highlighted in this Motion in accordance with Local Rule 6004-1(c)(i). Provisions relevant to the requirement in Local Rule 6004(c)(ii) are set forth below and in the proposed Bid Procedures Order.

a. Any prospective bidder other than Altair (each a "**Potential Bidder**") wishing to participate in the bidding process for the Assets must, no later than April 20, 2018 (*i.e.,* three days before the Auction (defined below)) at 4:00 p.m. EDT (the "**Bid Deadline**"):

    i. Submit to the Debtor, Altair, and any official committee of unsecured creditors appointed in this case (the "**Committee**"), through their respective counsel, an offer in the form of an executed asset purchase agreement (including all exhibits and schedules) redlined against the APA (the "**Modified APA**") without financing or due diligence contingencies, at a price that conforms with the following Paragraph ii and on terms no less favorable to the Debtor than those contained in the APA. The bid reflected in the Modified APA must be irrevocable through the Sale Hearing, unless the bid is selected as the Winning Bid or the Back-Up Bid (both terms defined below) at the Sale Hearing, in which case the bid must be irrevocable through the closing of the sale to the Winning Bidder or Back-Up Bidder (both terms defined below), in accordance with the terms of the Modified APA.

    ii. Agree in the Modified APA to a purchase price that provides for the following: (i) assumption of all Assumed Liabilities (as defined in the APA); (ii) payment in cash at closing in an initial minimum amount at least equal to **$2,950,000** — the sum of: (1) the Purchase Price reflected in the APA plus (2) the Breakup Fee and Expense Reimbursement (defined below), plus (3) an overbid amount of $100,000.

    iii. Make a cash deposit in the form of a cashier's check or wire transfer, in an amount not less than $250,000 (the "**Bid Deposit**") into the segregated escrow account (the "**Escrow Account**") established by counsel for the Debtor for this transaction. The Bid Deposit immediately becomes non-refundable (subject to the next sentence) and will be credited toward the purchase consideration if and when the transaction with the Potential Bidder making the deposit is approved by the Court as the winning bid (the "**Winning Bid**" and the "**Winning Bidder**") at the Sale Hearing and such transaction is closed in accordance with the terms of the Modified APA. If a Potential Bidder's bid is not designated as a Qualified Bid (defined below), or the bid is not approved as the Winning Bid or the Back-Up Bid at the Sale Hearing, the Bid Deposit of such bidder, plus accrued interest, if any, must be returned to such bidder no later than three business days after the Sale Hearing's conclusion.

    iv. Waive in writing any financing or due diligence contingency and state that the bidder has all required corporate authority to make the bid and consummate the proposed transaction.

    v. Provide written evidence reasonably satisfactory to the Debtor and the Committee of (A) the Potential Bidder's financial ability to fully and timely perform all obligations under the Modified APA and to provide adequate

assurance of future performance under all contracts and leases to be assigned to it, and (B) its qualification to own the Assets and operate the business that are the subject of the APA in compliance with all applicable federal, state, and local laws.

vi. Disclose any connections or agreements with the Debtor, Altair, any other known Potential Bidder, and any officer, director, or direct or indirect equity security holder of the Debtor.

b.   If a Potential Bidder complies with all the requirements described above by the Bid Deadline, the Debtor, in reasonable consultation with the Committee, must determine whether (i) the Potential Bidder has demonstrated the legal qualification and financial ability to consummate the proposed transaction, (ii) is reasonably likely to be able to and willing to consummate the contemplated transactions and (iii) has otherwise satisfied all of the requirements described above. If so, the Debtor must designate the Potential Bidder as a "**Qualified Bidder**" whose bid is a "**Qualified Bid**." The Debtor must promptly notify Altair of the identity of any other Qualified Bidder. Altair is deemed to be a Qualified Bidder and the APA a Qualified Bid for all purposes.

c.   If the Debtors receive at least one Qualified Bid from a Qualified Bidder other than Altair by the Bid Deadline, the Debtor must notify Altair and each other Qualified Bidder of an auction (the "**Auction**") to be conducted among them, subject to reasonable rules and procedures the Debtor may established consistent with the Court's order granting this Motion and in reasonable consultation with the Committee. The Auction to determine the successful bidder for the Assets will be held on April 24, 2018 at 10:00 a.m. EDT at the offices of The Rosner Law Group LLC, 824 N. Market Street, Suite 810, Wilmington, DE 19801, or at another place and time designated by the Debtor in a prior written notice emailed to all Qualified Bidders. Each Qualified Bidder participating at the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale and its Qualified Bid does not contain any financing or due diligence contingencies. The Auction is to be conducted openly, video-recorded or transcribed, with all Qualified Bidders, the Debtor, the Committee, and all creditors permitted to attend with their respective advisors. The Debtor must file a

notice of the Auction's results and the identity of the proposed Winning Bidder and any Back-Up Bidder on the Court's docket as soon as practicable after the Auction concludes.

d.   Only Qualified Bidders may bid at the Auction. Copies of all Qualified Bids are to be provided to the Committee by each Qualified Bidder no later than one business day before the Auction. At the commencement of the Auction, the Debtors must identify the bid determined to be the highest and best offer, then permit all Qualified Bidders to submit higher and better bids. Each subsequent bid must exceed the amount of the preceding bid by not less than $100,000 and may not be modified in a manner that causes it no longer to be a Qualified Bid.

e.   The Debtor, subject to the oversight and approval of the Court, and in reasonable consultation with the Committee, must supervise the bidding process and conduct the Auction so as to provide all Qualified Bidders a full, fair, and equal opportunity to participate. The Debtor, in consultation with its advisors and the Committee, must determine which Qualified Bid is to be recommended to the Court as the Winning Bid. The Debtor must request at the Sale Hearing that the Court authorize the Debtor to consummate the sale of the Assets to the Winning Bidder.

f.   The Qualified Bidder that makes the next-highest and best Qualified Bid to that of the Winning Bidder may elect (but has no obligation) to become the "**Back-Up Bidder**" with its last Qualified Bid serving as the "**Back-Up Bid**" to remain open and irrevocable in accordance with its terms pending the closing of the Winning Bid (the "**Closing Date**"). If the transaction with the Winning Bidder does not close by the Closing Date, then the Back-Up Bid, on the Debtor's written notice to the Back-Up Bidder, becomes the Winning Bid without further order of the Court, and the Back-Up Bidder must consummate the transaction in accordance with the APA or Modified APA, as applicable.

g.   If the Debtor does not receive at least one Qualified Bid other than from Altair, no Auction will be conducted. If so, the Court at the Sale Hearing may only consider approval of the transaction contemplated in the APA and may not consider any competing or

alternative offers or proposals to purchase any of the Debtor's assets or any objections to this Motion based on the existence or potential for other or different offers or proposals to purchase the Assets.

h. On approval by the Court of a Winning Bidder other than Altair, that Winning Bidder's Bid Deposit becomes non-refundable if the Winning Bidder's Modified APA is thereafter terminated as a result of that Winning Bidder's breach. The Bid Deposit of the Back-Up Bidder must remain on deposit in the Escrow Account pending the Closing Date, with such deposit becoming non-refundable if the Back-Up Bidder becomes the proposed Winning Bidder and its APA or Modified APA is thereafter terminated as a result of the Back-Up Bidder's breach. If a dispute arises over whether a Bid Deposit is refundable or non-refundable, the Bid Deposit must remain in the Escrow Account pending the Court's resolution of the dispute or written agreement of the parties.

i. If Altair becomes the Winning Bidder but the APA is terminated as a result of Altair's breach, Altair forfeits its Purchase Price Deposit (as defined in the APA) and is not entitled to the Breakup Fee or the Expense Reimbursement. If a Qualified Bidder other than Altair becomes the proposed Winning Bidder but its Modified APA is terminated as a result of the Winning Bidder's breach, the Winning Bidder forfeits its Bid Deposit. In either case, the forfeiture of a deposit constitutes liquidated damages; the Debtor and its estate retain no other rights, remedies, claims, counterclaims, or defenses against the Winning Bidder.

16. The Debtor requests that the Court schedule a hearing on or about April 18, 2018 (the "**Sale Hearing**") to consider approving the sale of the Assets and the assumption and assignment of associated contracts and leases (the "**Transaction**") to the Winning Bidder (and any Back-Up Bidder). The Debtor proposes that objections to the Transaction—including any objections to the assumption and assignment of a contract or lease or to any proposed cure amount associated with such assumption and assignment—be filed and served no later than April 20, 2018 at 4:00 p.m. EDT, the same date and time as the Bid Deadline. The Debtor

further proposes that any objections to the conducting or the results of the Auction be due no later than 24 hours before the start of the Sale Hearing.

**Proposed Bid Protections**

17. Subject to the Court's approval, under Section 8.3 of the APA, Altair would be entitled to a fee of $80,000 (the "**Breakup Fee**") and reimbursement of Altair's actual fees and costs, including attorneys' fees and other professional fees, incurred in connection with the Transaction in an amount not to exceed $175,000 (the "**Expense Reimbursement**") if the APA is terminated for any reason set forth in Section 8.1 of the APA other than Section 8.1(b) (Altair's refusal to close if the Closing has not occurred by the "Outside Date" of 60 days after the Petition Date), 8.1(d) (Altair's breach of its representations, warranties, or covenants) or 8.1(*l*) (Altair fails to close when all conditions to closing having been met). These circumstances include, among others, the inaccuracy of the Debtor's representations or warranties, the conversion of this case, or, notably, if Altair is not the Winning Bidder at the Auction. The Breakup Fee and the Expense Reimbursement would be an administrative expense of the estate under Bankruptcy Code § 503(b) and would be due within three business days of the applicable termination date.

18. Under Section 8.3(b) of the APA, except for Altair's rights under the debtor-in-possession loan facility and the associated financing order, the receipt of the Breakup Fee and Expense Reimbursement is Altair's sole and exclusive remedy against the Debtor under the APA other than in the case of fraud. Altair has released the Debtor and its former, current or future directors, officers, employees, agents, general or limited partners, managers, members, stockholders or assignees or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, affiliate or assignee of any of the foregoing, from any claim or remedies Altair may have against any of those parties in respect of any breach of or default under the APA other than in the case of fraud.

19. Under Section 8.3(c) of the APA, the Debtor has acknowledged and agreed that the Breakup Fee and Expense Reimbursement are integral parts of the Transaction and that, without them, Altair would not have agreed to enter into the APA, move forward with the Transaction, and provide the proposed debtor-in-possession financing.

## Notice Procedures

20. Once this Court approves the Bid Procedures and a date and time for the Sale Hearing and the applicable associated objection deadlines, the Debtor proposes to give immediate notice, by email or overnight mail in all instances, of the Bid Procedures, the Sale Hearing, and all objections deadlines and procedures to all creditors, all non-Debtor parties to any executory contracts and the Oakland Lease (whose notices will also contain information pertaining to the cure amount associated with their contract or lease), and all parties previously contacted or expressing an interest in a purchase of the Assets. The Debtor submits that this form and manner of notice (the "**Notice Procedures**") are more than reasonable and effective under the circumstances to give Potential Bidders the knowledge needed to participate in the bidding process and a full and fair opportunity to do so, all for the benefit of the estate.

## Justification for Bid Procedures and Bid Protections

21. Under Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by auction. The Debtor has obtained a stalking horse bid from Altair and seeks authority to conduct the Auction in accordance with procedures under which Altair's bid will be subjected to higher and better offers. The Bid Procedures are of a type customarily approved in this Court for sales of going-concern assets and are reasonably calculated to encourage bidding and to maximize the value of the Assets for the benefit of the Debtor's estate.

22. Altair will be the stalking horse for competitive bids, potentially leading to further competition and the establishment of a baseline against which higher and better offers can be attracted and measured. The Debtor will further solicit proposals for the Transaction before the proposed Bid Deadline and, based on those efforts coupled with the Debtor's extensive prepetition marketing of its Assets, the Debtor will have more than sufficiently marketed the Assets before the Sale Hearing. The Bid Procedures are designed to maximize the value paid for the Assets in a context in which the only viable method of obtaining a return to creditors is through a prompt sale of the Assets. Accordingly, good cause exists to approve the Bid Procedures; they are fair and reasonable under the circumstances and will encourage competitive bidding and the highest and best price for the Assets.

23. Courts frequently approve competitive bidding procedures like the proposed Bid Procedures as a means of ensuring that such sales will maximize value for the estate. The Bid Procedures proposed here do not differ in any material respect from those approved and employed time and again in this Court for going-concern sales under § 363.

24. The Debtor believes that the agreement to pay the Breakup Fee and the Expense Reimbursement on the terms set forth in the APA is necessary to induce Altair to enter into the Transaction, to allow its offer to be exposed to higher and better offers, and to compensate Altair for the risk associated with allowing competitors to exploit Altair's assessment of value, willingness to consummate the Transaction, and due diligence and, therefore, to enable the Debtor to obtain the highest and best possible price for the Assets.

25. Bidding protections such as the Breakup Fee and Expense Reimbursement encourage a potential purchaser like Altair to invest the substantial time, money, and effort to negotiate with the Debtor and perform the necessary due diligence attendant to the acquisition of the Assets, despite the many risks and uncertainties inherent in the Chapter 11 process. Bankruptcy courts have long recognized that the considerable expense and risk stalking horse buyers incur should be compensated and have approved bidding protections similar to the Breakup Fee and the Expense Reimbursement under the "business judgment rule," which

prohibits a court from second-guessing corporate directors' decisions made in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

26. *In Calpine Corp. v. O'Brien Envtl. Energy, Inc.,* 181 F.3d 527 (3d Cir. 1999), the court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code § 503(b) should govern in bankruptcy cases.  To be approved, bidding incentives such as the Breakup Fee and Expense Reimbursement must provide some benefit to the estate. 181 F.3d at 533. There, the Third Circuit identified at least two instances in which bidding incentives may provide benefit to an estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induces a bidder to research the value a debtor's assets and submit a bid that serves as a minimum bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

27. Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Breakup Fee and Expense Reimbursement are easily justified. The APA and the Debtor's agreement to pay the Breakup Fee and the Expense Reimbursement under limited circumstances are the product of good faith, arm's-length negotiations between the Debtor and Altair. The Breakup Fee's amount, as viewed as a percentage of the Purchase Price, is well within the range of breakup fees judged as fair and reasonable in comparable cases. The Breakup Fee and Expense Reimbursement are reasonably intended to compensate for the many substantial risks Altair has agreed to bear by serving as a stalking horse bidder.

28. These bid protections have already conferred an important benefit to the estate in that they have encouraged competitive bidding—Altair would not have entered into the APA without them. The Breakup Fee and the Expense Reimbursement have "induc[ed] a bid that otherwise would not have been made and without which bidding would [be] limited." 181 F.3d at 537. Similarly, Altair's offer provides a minimum bid on which other bidders can rely, "increasing the likelihood that the price at which the [Assets will be] sold will reflect [their] true worth." *Id.*

29. Finally, because the Bid Procedures are customary and fair procedures reasonably intended to encourage competitive bidding, the Breakup Fee and the Expense Reimbursement will permit the Debtor to insist that competing bids for the Assets made in accordance with the Bid Procedures be materially higher and otherwise better than Altair's offer, conferring a clear benefit to the Debtor's estate.

30. For these reasons, the Debtor respectfully requests approval of the Bid Procedures, the Breakup Fee and the Expense Reimbursement as an administrative expense claim under the Bankruptcy Code, the Notice Procedures, and the scheduling of the Sale Hearing.

**Sale of Assets**

31. Bankruptcy Code § 363(b) permits a debtor-in-possession, after notice and a hearing, to sell property of the estate other than in the ordinary course of business. Courts have uniformly held that approval of a proposed sale of property under § 363(b) is appropriate if the transaction is supported by the debtor-in-possession's reasonable business judgment. *See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983); *see also In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 176 (D. Del. 1991) (holding that a court must be satisfied that there is a "sound business reason" justifying the pre-confirmation sale of assets); *In re Abbotts Dairies Pennsylvania, Inc.,* 788 F.2d 143 (3d Cir. 1986); *Stephens Indus. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986).

32. Here, the Debtor has determined in its best business judgment that, because the Debtor has no further access to operating capital and cannot reasonably expect to generate any material revenue in the foreseeable future, the only means by which creditors may obtain any recovery is through a prompt sale of the Debtor's Assets as a going concern. The pressing need to timely and carefully complete a successful operational transition of all Assets to Altair necessitates a § 363 sale process rather than the far more protracted, expensive, and uncertain process associated with a Chapter 11 plan. These circumstances are entirely consistent with the longstanding rationale for authorizing a sale of the Assets under § 363 rather than under a confirmed Chapter 11 plan. *See In re Continental Air Lines, Inc.,* 780 F.2d 1223 (5th Cir. 1986); *Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *Financial Assocs. v. Loeffler (In re Equity Funding Corp. of America)*, 492 F.2d 793, 794 (9th Cir. 1974), *cert. denied*, 419 U.S. 964 (1974) ("Other circuits have recognized the power of the bankruptcy court under Chapter X to authorize a sale of the debtor's property under less than emergency conditions where such sale is necessary to avoid deterioration in the value of the assets") (citations omitted); *In re Walter,* 83 B.R. 14 (9th Cir. 1988); *In re Wilde Horse Enterprises, Inc.,* 136 B.R. 830 (Bankr. C.D. Cal. 1991).

33. The proposed Transaction would transform the Assets (mostly complex intellectual property that is difficult to liquidate) to cash for the maximum benefit to the estate under the present circumstances. The distribution of all cash proceeds generated from this proposed sale (as well as any other sales of assets in this case) will be distributed to creditors in accordance with the Bankruptcy Code and orders of this Court. *See In re Torch Offshore, Inc.*, 327 B.R. 254, 259 (E.D. La. 2005) (noting that the sales were "only exchanges of assets for cash. They [did] not contain any provisions dictating the terms of any future reorganization plan, preordaining the way creditors will vote on such a plan, or attempting to vary the priorities of Torch's creditors").

34. As further described in the APA, Altair proposes to purchase the Assets for a package of consideration exceeding $2.5 million. After satisfaction of the Debtor's modest prepetition

secured debt to the Bridge Loan Lenders, and after carveouts for likely administrative expenses, the Debtor's unsecured creditors could recover in excess of 20¢ on the dollar.

**Sale Free and Clear**

35. The Debtor proposes to sell the Assets free and clear of all liens, claims, encumbrances, and interests under § 363(f). Based on its review of public records, the Debtor believes that the only parties with an interest in the Assets are the Bridge Loan Lenders, who filed UCC-1 financing statements to secure the Debtor's repayment of $223,000 in prepetition loans made shortly before the Petition Date. The Bridge Loan Lenders extended those loans specifically to "bridge" the Debtor to the consummation of the Transaction with Altair and support this Court's approval of the Transaction in all respects. In that respect, the Bridge Loan Lenders have consented to the sale of Assets free of their interest under § 363(f)(2) as long as sufficient proceeds of the sale are used to satisfy the Bridge Loan Lenders' secured claim in full at Closing, which the APA explicitly contemplates and requires. (For this reason, the Bridge Loan Lenders' interest in the Assets is adequately protected under § 361.) Moreover, the price being paid for the Assets that constitute the Bridge Loan Lenders' collateral far exceeds the only lien on the Assets, so the proposed sale may be made free and clear of the Bridge Loan Lenders' lien under § 363(f)(3). Finally, as lenders of money in exchange for a lien on collateral, the Bridge Loan Lenders could be compelled in a legal or equitable proceeding to accept a money satisfaction of their interest in the Assets—again, something that is explicitly contemplated and required in the APA—thus satisfying § 363(f)(5).

**Good Faith**

36. "[W]hen a bankruptcy court authorizes a sale of assets under § 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser." *In re Abbotts Dairies, Inc.,* 788 F.2d 143, 149-50 (3d Cir. 1986). The purpose of such a finding is to facilitate a safe-harbor determination under § 363(m), which protects purchasers against the invalidation of a sale

following a reversal or modification of a bankruptcy court's sale order when the sale is made in "good faith."

37. Section 363(m) serves the important purposes of encouraging good faith transactions and of preserving the finality of the bankruptcy court's sale order. *In re Abbotts Dairies*, 788 F.2d at 147. Courts have generally held that a good faith purchaser is one who buys "in good faith" and "for value"; a lack of good faith may be present when, among other things, there exists fraud or collusion. *In re Ewell*, 958 F.2d 276, 281 (9th Cir. 1992).

38. Here, both the Debtor and Altair have conducted themselves at all times in good faith and have negotiated the Transaction at arm's length without fraud or collusion. Altair is paying fair value for the Assets. Accordingly, the Debtor requests that the Court's order granting this Motion also find that Altair has acted in good faith and is entitled to the protections of § 363(m).

**Preservation of Credit Bid Rights**

39. The Bridge Loan Lenders have a right to credit bid up to their respective debt amounts at any § 363 sale of their collateral. Although, as the Debtor believes, the Bridge Loan Lenders have consented to the sale of the Assets that constitute their collateral free and clear of their security interests, nothing in this Motion or in the APA seeks to limit or otherwise affect the Bridge Loan Lenders' credit bid rights under Bankruptcy Code § 363(k).

**Waiver of Stay of Sale Order**

a.   Given the pressing interests of the estate's creditors and the urgency with which the Debtor must consummate the Transaction—Altair has made it an express condition of its willingness to complete the Transaction that the Closing occur as soon as possible after this Court's approval of the Transaction—it is imperative that the parties be able to close the Transaction as soon as practicable after the entry of an order approving the Transaction. Accordingly, the Debtor requests that the Court waive the 14-day stay of the order approving

the sale and the assumption and assignment of the Assumed Contracts and Assumed Leases under Bankruptcy Rules 6004(h) and 6006(d), which those rules leave to this Court's discretion.

**Assumption and Assignment of Contracts and Leases**

40. The Debtor and Altair have identified the Oakland Lease that would be assumed and assigned to Altair under § 365(a) and (f). The Debtor does not believe that any cure amount is due under the Oakland Lease. If the Debtor and Altair identify any other executory contracts or unexpired leases to be assumed and assigned to Altair, the Debtor will file a notice of those, together with any proposed cure amount, and serve that notice with the Bid Procedures Order in accordance with the Notice Procedures described above.

41. The Debtor proposes to assume and assign to Altair all the above contracts and leases (the "**Assumed Contracts**"). In accordance with § 365(f)(2)(A), the Debtor proposes to assume each of the Assumed Contracts and may do so without restriction under § 365(c). In accordance with § 365(f)(2)(B), the counterparty under each Assumed Contract is adequately assured of future performance by Altair by virtue of Altair's demonstrable financial stability, professional management, and long history of stable operations. Altair will provide any additional evidence reasonably requested by a counterparty assuring future performance. Although the Debtor does not believe any cure amounts are due to any Assume Contract counterparty under § 365(b)(1), the Debtor believes that any cure amounts ultimately required to be paid under § 365(b)(1) to cure any monetary default under any Assumed Contract will be paid in full in cash at the Closing of the Transaction from the cash proceeds of that Closing.

42. Where the debtor-in-possession has determined that assumption of an executory contract or unexpired lease is in the best interest of its business or furthers a legitimate reorganization goal, the bankruptcy court may only perform a "cursory review" of that decision. *See, e.g., In re G.I. Industries, Inc.,* 204 F.3d 1276, 1282 (9th Cir. 2000). After a debtor assumes an executory contract, it may then assign that executory contract under § 365(f). Here,

as demonstrated above, sound business reasons exist for the Debtor to assume and then to assign the Assumed Contracts to Altair.

43. Given how integral the Assumed Contracts are to Altair's use of the Assets, it is imperative that the parties be able to complete the assumption and assignment of the Assumed Contracts simultaneously with the closing of the Transaction and as soon as practicable after the entry of an order on this Motion. Accordingly, the Debtor requests that the Court waive the 14-day stay of the order approving the assumption and assignment of the Assumed Contracts under Rule 6006(d), which that rule leaves to this Court's discretion.

**Notice**

44. The Debtor has provided notice of this Motion by email or overnight mail to the Office of the US Trustee, all secured creditors, the Debtor's 20 largest unsecured creditors, all counterparties to the Assumed Contracts, and all parties that have filed a request for notices under Bankruptcy Rule 2002. The Debtor has requested an expedited hearing on the entry of the Bid Procedures Order.

45. In addition to the Notice Procedures proposed above, within one business day of the entry of the Bid Procedures Order, the Debtor commits to serving the Bid Procedures Order and notice of this Motion by email or overnight mail on the Office of the United States Trustee, all creditors and executory contract counterparties appearing on the Debtor's Schedules of Assets and Liabilities, the Bridge Loan Lenders, counsel for Altair, all parties that file a request for notice under Bankruptcy Rule 2002, and all federal, state, and local taxing authorities reasonably believed to have an interest in the relief requested in this Motion. The content and extent of this proposed notice satisfies the requirements of Bankruptcy Rule 2002(a) and (c) and is, therefore, adequate under the circumstances. *See, e.g., In re Delaware & Hudson Ry.*, 124 B.R. 169, 180 (Bankr. D. Del. 1991) (the disclosures necessary in a sale notice need only include the terms of the sale and the reasons why such a sale is in the best interests of the estate and do not need to include the functional equivalent of a disclosure statement).

## CONCLUSION

For the foregoing reasons, the Debtor respectfully requests that the Court enter the Bid Procedures Order substantially in the form attached to this Motion as Exhibit B, enter the Sale Order substantially in the form to be filed shortly after entry of the Bid Procedures Order, and grant any additional relief the Court deems appropriate.

March 29, 2018

**THE ROSNER LAW GROUP LLC**

*/s/ Frederick B. Rosner*
Frederick B. Rosner (DE #3995)
Scott J. Leonhardt (DE #4885)
Jason A. Gibson (DE #6091)
824 N Market Street
Suite 810
Wilmington DE 19801
(302) 777-1111
Email: rosner@teamrosner.com
        leonhardt@teamrosner.com
        gibson@teamrosner.com

/and/

**PERKINS COIE LLP**
Jordan A. Kroop (*Pro Hac Vice* admission pending)
2901 N Central Ave | Suite 2000
Phoenix AZ 85012
(602) 351-8000
Email: jkroop@perkinscoie.com

*Proposed Co-Counsel to Debtor-in-Possession*